AMERICAN CLIPPER CORPORATION v. WALTER SCOTT HOWERTON AND FINANCEAMERICA CORPORATION

No. 8018SC674

(Filed 21 April 1981)

**Automobiles § 5– sale of new recreational vehicle – failure to deliver manufacturer's statement of origin – holder of title**

In an action for a declaratory judgment to determine the right to ownership, title, possession or a security interest in a recreational vehicle as between plaintiff-manufacturer and defendant-consumer financer, the trial court properly entered summary judgment for plaintiff where the stipulated facts and partial settlement agreement entered into by the parties tended to show that the manufacturers' statements of origin were at all times in the possession of plaintiff; the seller with whom plaintiff had a consignment arrangement sold the vehicle without assigning the manufacturers' statements of origin to defendant-consumer as required under G.S. 20-52.1(c); defendant-financer loaned money and took a security interest in the vehicle without taking possession of the manufacturers' statements of origin or even inquiring about their whereabouts; in all respects, the transactions involving the vehicle were conducted in violation of G.S. 20-52.1; under the statute record title to the new vehicle could not "pass or vest" until the manufacturers' statements of origin were properly assigned; and record, paper title therefore remained in the name of plaintiff-manufacturer.

APPEAL by defendant from *Riddle, Judge.* Judgment entered 6 June 1980 in Superior Court, GUILFORD County. Heard in the Court of Appeals 4 February 1981.

Plaintiff brought this action for a Declaratory Judgment pursuant to G.S. 1-253 to determine the right to ownership, title, possession or a security interest in a recreational vehicle as between the plaintiff-manufacturer and the defendant-consumer financer. Plaintiff prevailed in the trial court.

The facts upon which the trial judge based his Declaratory Judgment were stipulated to by the parties. Plaintiff, American Clipper Corporation [Clipper] purchased a chassis, motor, and transmission from Chrysler Corporation [Chrysler] for installation in one of its own Clipper Recreational Vehicles. Clipper received from Chrysler a manufacturer statement of origin [Chrysler MSO] for the parts purchased; completed manufacture of the recreational vehicle; assigned the vehicle a Clipper serial number; and shipped the vehicle, the Chrysler MSO and its own supplemental MSO to one of its dealers in Maryland. The Maryland dealer denied having ordered the vehicle and refused to accept it. After this refusal, the original (Chrysler) MSO was destroyed, and Clipper requested, received, and held onto a duplicate MSO from Chrysler.

Rather than shipping the vehicle back to its California plant, Clipper shipped the vehicle to a North Carolina dealership, Adventure America, Inc. [Adventure] on 10 October 1978. Clipper and Adventure had a prior course of business dealing, and this shipment was not unusual. Accompanying the vehicle was a written document from Clipper revealing a purchase price of $15,076 and a statement that "[t]his is not a [sic] invoice. ..." Instructional material, an owner's manual, and Clipper and Chrysler warranty forms were included with the vehicle, but the duplicate Chrysler MSO and Clipper supplemental MSO which are usually issued by Clipper to its dealer-purchaser, remained in the possession of Clipper. Clipper considered this transaction with Adventure to be a consignment and kept the vehicle on its own inventory list. Clipper was willing to sell the vehicle to Adventure at Adventure's option, but no money ever exchanged hands between Adventure and Clipper with regard to this vehicle. The understanding between the two was that Clipper could reclaim possession of the vehicle

at any time prior to Adventure's accepting Clipper's offer to sell for the specific price of $15,076.

It was understood between Clipper and Adventure that Adventure would show the vehicle to potential purchasers at a price of its own choosing and would try to find a willing buyer. Once a buyer was found, Adventure would notify Clipper and accept Clipper's offer to sell. From October 1978 until June 1979, periodic telephone contacts between Clipper and Adventure resulted in assurances to Clipper that the vehicle was still on Adventure's lot. On 12 April 1979 however, Adventure entered into a Consumer Credit Installment Sales Contract with defendant, Walter Scott Howerton, for the purchase of the Clipper Recreational Vehicle at a price of $20,799. Howerton made a $2,034 down payment and was given $3,265 as a trade-in credit for his 1977 Plymouth van; this left a cash balance of $15,500. As a "buyer in the ordinary course of business" from Adventure as defined by the North Carolina Uniform Commercial Code, G.S. 25-1-201(9), Howerton, with the assistance of Adventure, applied for a North Carolina Certificate of Title and obtained a 20-day temporary registration. At this time, Adventure had a business relationship with defendant FinanceAmerica [Finance] in which Finance would help finance consumer purchases. Pursuant to this business relationship, Howerton applied for and had approved by Finance a credit application for the balance of $15,500 due on the Clipper Recreational Vehicle.

Upon Finance's approval of Howerton's credit application, Adventure delivered the vehicle to Howerton; Finance paid $15,500 to Adventure; and in return, Adventure assigned Howerton's Installment Sales Contract to Finance. Following this transaction, Finance relied on Adventure, based on their prior dealings, to process Howerton's Application for Certificate of Title together with the required Chrysler MSO and supplemental Clipper MSO through the North Carolina Department of Motor Vehicles. Finance also relied on Adventure to record Finance's lien on the Certificate of Title once it was issued. At no time did Finance request to see or request delivery of the Chrysler MSO or supplemental Clipper MSO. Finance made no effort to determine if Adventure possessed either MSO. (Both MSO's were in the possession of Clipper.) Adventure never processed Howerton's applications through the Department of Motor Vehicles, leaving the vehicle untitled as of

the date this suit was filed. In June 1979, Clipper first learned that the vehicle was gone from Adventure's lot.

Just prior to the filing of Clipper's Complaint for Declaratory Judgment, Clipper, Finance and Howerton entered into a Partial Settlement Agreement. Pursuant to this Agreement, Clipper forwarded to Finance the Chrysler MSO and its own supplemental MSO, to be used by Howerton to secure title to the recreational vehicle. Howerton acknowledged and released all claims he might have with regard to the validity of the assignment of his Installment Contract from Adventure to Finance. Additionally, Howerton, for purposes of this Declaratory Judgment action, agreed to grant Finance sole responsibility for defending against Clipper's complaint. The parties also agreed to be bound by the trial judge's Declaratory Judgment. If Clipper should be adjudged to have superior title to the vehicle, Finance agreed to pay Clipper the original sales price of $15,076 plus interest. Clipper and Finance agreed not to look to Howerton for payment of any final judgment because Howerton agreed to continue to pay off his Installment Sales Contract held by Finance.

Based on these stipulated facts and the Partial Settlement Agreement entered into by the parties, the trial judge granted Summary Judgment for Clipper in the Declaratory Judgment action. Finance is here appealing from that adverse judgment.

*Turner, Enochs, Foster, Sparrow & Burnley, P.A., by Wendell H. Ott, for the plaintiff-appellee.*

*Richard M. Pearman, Jr. for the defendant-appellant.*

BECTON, Judge.

The only issue raised on appeal is whether the trial judge committed error in granting summary judgment for Clipper in this Declaratory Judgment action.

In its complaint for Declaratory Judgment, Clipper incorporates by reference the Partial Settlement Agreement entered into by all the parties which states in pertinent part that:

All parties agree that if Clipper shall obtain a favorable final judgment in the declaratory judgment action referred to above, holding that its right to ownership, title, possession *or* a security interest with respect to said vehicle *is*

*superior* to that of either Howerton *or* Finance, it will receive and accept from Finance the sum of Fifteen Thousand Seventy-Six Dollars ($15,076) plus interest at the rate of eight percent (8%) per annum ... in lieu of reclaiming possession of and/*or* title to said vehicle. ... (Emphasis added.)

Appellant, Finance, contends that the Uniform Commercial Code [UCC], G.S. 25-1-101 *et seq.*, as adopted by North Carolina should govern the rights of the parties in this dispute. Relying on the UCC, Finance argues that ownership, title and possession of the Clipper Recreational Vehicle vested in the vehicle purchaser, Howerton, once he took possession, and therefore prevents Clipper from asserting any rights in the vehicle. Since, under the UCC, Clipper could not prevail over the purchaser, Howerton, Finance argues that Clipper cannot prevail over Finance. Finance's reliance on the legal relationship between Clipper and Howerton is misplaced with reference to its own rights and liabilities vis-a-vis Clipper. As stated in their Partial Settlement Agreement incorporated in Clipper's complaint, the trial judge need only have found that Clipper's rights to the vehicle were "superior to that of *either Howerton or Finance. ...*" Clipper clearly has superior title in the vehicle as between itself and Finance.

G.S. 20-52.1(c) states in pertinent part that:

(c) Upon sale of a new vehicle by a dealer to a consumer-purchaser, the dealer shall execute in the presence of a person authorized to administer oaths an assignment of the manufacturer's certificate of origin for the vehicle, including in such assignment the name and address of the transferee and no title to a new motor vehicle acquired by a dealer under the provisions of subsections (a) and (b) of this section shall pass or vest until such assignment is executed and the motor vehicle delivered to the transferee.

Any dealer transferring title to, or an interest in, a new vehicle shall deliver the manufacturer's certificate of origin duly assigned in accordance with the foregoing provision to the transferee at the time of delivering the vehicle, except that where a security interest is obtained in the motor vehicle from the transferee in payment of the purchase price or otherwise, the transferor shall deliver the

manufacturer's certificate of origin to the lienholder and the lienholder shall forthwith forward the manufacturer's certificate of origin together with the transferee's application for certificate of title and necessary fees to the Division.

It is stipulated by the parties that the Chrysler MSO and the Clipper supplemental MSO were at all times in the possession of Clipper. Adventure sold the vehicle without assigning the MSO to Howerton as required under the statute. Finance loaned money and took a security interest in the vehicle without taking possession of the MSO or even inquiring about its whereabouts. In all respects, the transactions involving the vehicle were conducted in violation of G.S. 20-52.1. Under the statute, record title to the new vehicle cannot "pass or vest" until the MSO is properly assigned. Hence, record, paper title remained in the name of Clipper.

Although G.S. 25-2-401 provides that the provisions of the UCC apply to the rights and liabilities of parties to a sales transaction "irrespective of title to the goods," the motor vehicle certificate of title statutes, including G.S. 20-52.1, still have vitality and are not implicitly replaced by the adoption of the UCC. *See* Anderson, *Uniform Commercial Code, "Motor Vehicles,"* §2-401:9 (1971); *Insurance Co. v. Hayes,* 276 N.C. 620, 174 S.E. 2d 511 (1970).

Pursuant to G.S. 20-52.1 then, Clipper was record title holder to the recreational vehicle in the possession of Howerton. According to the record, Finance never filed or perfected its security interest in the vehicle. If Finance had taken the steps necessary to file or perfect its security interest, it would have discovered that Adventure did not have record title to the vehicle, nor did Howerton. In allocating the risk of loss between Clipper and Finance, Finance was in the best position to prevent the title confusion which ensued. Finance incurred the risk of loss when it loaned money on collateral without first determining whether its assignor, Adventure, or its debtor, Howerton, had record title to the vehicle. Clipper did the most that it could as a manufacturer; it held onto its MSO and awaited acceptance by Adventure of its offer to sell the vehicle in question. As between Clipper and Finance, then, the trial judge properly found that Clipper held title to the vehicle superior to

the rights and title held by Finance. Finance, therefore, should bear the risk of loss accompanying the sale and financing of this vehicle.

It should be noted that this case in no way decides the right to ownership, title and possession of the vehicle as between the manufacturer, Clipper, and the consumer, Howerton. Even if Howerton were found to have superior title to Clipper, under the facts and agreements of this case, Clipper would still have title superior to Finance and would prevail against Finance.

Based on the stipulated facts and Partial Settlement Agreement entered into by the parties, we find that the trial judge acted properly in granting Clipper's motion for summary judgment.

Affirmed.

Chief Judge MORRIS and Judge VAUGHN concur.